So our next case is Henry Rosenberger's 5-2301-57. I've got Mr. Sullivan? Yes. Okay. Is Mr. Kiley? Yes, sir. Okay. I forgot to tell counsel, when you come up, be sure to state your name for the record when you start your oral argument. Counsel, are you ready to proceed? I am. Then go right ahead. I'm sorry? Sure. Just give us a moment. We originally thought we had time to go back and gather our things. But we do have time. No rush on my end, Your Honor. And I'm trying to remember, what county is this case from? We're both from Macon County, Your Honor. In fact, we should have carpooled this morning, but didn't think about that until I hit Vandalia. Well, I just thought I remembered when I was reading through it. It's like, this is one of the new counties. First, it's not new. Well, now. One thing that's noteworthy about Macon County is the number of 4th district judges that live in the 5th district. That's right, Your Honor. Are you ready, Justice Moore? I am. All right. Then, Mr. Sullivan, go right ahead. Thank you, Your Honor. May it please the Court, my name is Patrick Sullivan, on behalf of the respondent appellant, Don Rosenberger, this morning. Essentially, we are here for three reasons. We are here because the trial court's findings were contradicted by clear, competent evidence of records in certain respects. We are here because the trial court failed to weigh certain mandatory statutory factors set out in the Illinois Marriage and Dissolution of Marriage Act, requiring Mrs. Rosenberger to pay more than her equitable share of marital debt and unjustly forcing her to pay her own attorney's fees. Finally, we are here because the trial court completely failed to comply with Section 602.7 and 603.10 of the IMDMA in restricting Mrs. Rosenberger's parental rights. Some of the trial court's findings were against the manifest weight of the evidence. In particular, the trial court's finding as to the value of Mr. Rosenberger's bank account, the value of his 2015 Dodge 2500 truck, and Mr. Rosenberger's annual income. All the court's findings related to those items were contradicted by competent, credible evidence of record. In paragraph 20 of the trial court's record, at page C363 of the record, the court found that based on Mr. Rosenberger's November 1, 2021 financial affidavit, he possessed two bank accounts at Heartland Bank and Trust containing a combined $17,000. The court ordered that Mr. Rosenberger pay Mrs. Rosenberger half that amount. The court's findings as to the value of Mr. Rosenberger's bank account were erroneous. At page R196 of the record, during the April 21, 2022 hearing, Mr. Rosenberger admitted recently receiving his annual bonus, and he admitted that that money was in the account, agreeing with counsel on cross-examination that the money was, quote, sitting there subject to whatever the court may decide to do with it. The net value of that annual bonus was $32,700. Mr. Rosenberger therefore admitted that his bank account held more than $32,700 more than he stated in his financial affidavit. That bonus alone was worth almost twice what the court found. Let me stop you there, if I could, counsel. Yes, Your Honor. Isn't it correct, though, that his November affidavit was prepared in advance of a trial date that was set in December? Is that correct? That's correct, Your Honor. All right. And that trial date was later continued. Is that correct? That is also correct, Your Honor. And that was based on the appellant, correct? The request for the motion to continue or extension of time was based on the appellant's request, correct? It was, Your Honor. The original trial was set for half a day. Okay. And at the end of that half a day, they continued for cross-examination at a later date. So most probably the trial is going to extend to that time regardless of any motion for continuance below. But at that point in April, when the trial was continued to the extended period of time, whichever the basis was, isn't it correct that at that time the circumstances had changed in that the appellee had received the bonus? So it wasn't that it was omitted necessarily from the financial affidavit. Is that correct? That's correct, Your Honor. We don't contest that Mr. Rosenberger erred by not including that in his financial affidavit. Our position is that the trial court erred by not factoring in that $32,700 into its final judgment. Now, isn't it also correct that the trial court has latitude to determine the data value? That is correct, Your Honor. The trial court can set the data valuation either on a date agreed by the parties, on a date set by the trial court, or during the trial itself. Now, the trial here extended from December through May, December 2021 through May of 2022. So our position is that entire time is a time during which a court should have set the value. Now, as to your question, Your Honor, about can't the court set the date, yes, a court can do that. But it must be consistent in setting that date. For example, at page... If I may have a moment, Your Honor. I don't have an exact paragraph at mind, Your Honor, but in the court's order, when it's setting the value of the parties... It is a bank account, actually, Your Honor. The court set the parties' bank account values for Mr. Rosenberger based on his November 1, 2021 financial affidavit, and set the value of Mrs. Rosenberger's bank account based on her January 19, 2022 affidavit. But let me stop you there. Wasn't her affidavit due in November, counsel? And wasn't it late? I'm not entirely sure on that, Your Honor. Okay. I can follow up with you if you would like. There wasn't a November... Do we agree that there wasn't a November affidavit for her? Correct, Your Honor. All right. So wouldn't the trial court be in a position that that would be all that they had in terms of evaluation date? That would explain the disparity between the two parties? Yes, Your Honor, absolutely. That would explain why the court set their bank accounts on that day as it did. But our position is that it's inconsistent with Section 503K, I believe it is, stating that the trial court must set evaluation based on one of those three possibilities, an agreement, a date established by the court, or the date of the trial. But I guess my question is, counsel, how does the court, if it has two affidavits and one is dated in November and the other is dated December, and albeit it may be late, I'm not sure at this point why, doesn't the court have nothing else to look at in terms of a date? Absolutely not, Your Honor. The court had all of the evidence presented at the trial. Imagine, if you will, that the parties submitted their financial affidavits like they did, and then one of them won the lottery and put all that money into the bank account. Well, the court isn't realistically going to say, well, I'm stuck with financial affidavits that were submitted. If testimony is admitted that Mr. Rosenberger, for example, won the lottery, surely the court is going to say, well, you're going to divide that money in the bank account. Thank you. I think we've thoroughly discussed the bank account. We'll quickly touch on Mr. Rosenberger's truck. And essentially it's the same issue where, maybe not quite the same issue exactly, and the court valued Mr. Rosenberger's truck based on an evaluation he obtained from the dealership, and Mrs. Rosenberger submitted an evaluation from the National Automobile Dealers Association. The court discounted Mrs. Rosenberger's evaluation because, quote, Wife's NADA evaluation does not take into account the high mileage of the vehicle or the fact that the heat does not work. But at page E13 of the record, which is Mrs. Rosenberger's evaluation, we see that the value is initially set as a base value, and then it's affected by certain factors related to the truck, one of which is that the mileage is $281,000, exactly contradicting the court's finding. To conclude our discussion on the truck, it should be noted that the trial court ordered Mr. Rosenberger to pay half the value of the truck, reduced by the amount of debt stated on the truck, which in Mr. Rosenberger's financial affidavit was $6,752. However, Mr. Rosenberger also submitted a schedule of debts paid at page E3, volume 2 of the record, showing that he paid $780 per month on the truck, and there's no evidence showing that he stopped making those payments during the course of trial. Therefore, the court erred by reducing Mr. Rosenberger's debt on the truck by the full value stated in the financial affidavit. And finally, the court erred in calculating Mr. Rosenberger's annual gross income, which had the effect of reducing the amount of maintenance that Mrs. Rosenberger received. As this court knows, the maintenance award is calculated based on the party's income, which is a term not defined in the IMDMA, but which has been interpreted by the Illinois Supreme Court in several ways, which ultimately boils down to being a payment received. At paragraph 8 of the trial court's order at page C361, the court found that Mr. Rosenberger's monthly gross income was $19,113.78. The exact amount, down to the penny, stated in Mr. Rosenberger's financial affidavit. So according to the court, Mr. Rosenberger received $229,365.36 in 2021. But then when we look at Mr. Rosenberger's pay stub, at page E12 of the record, we see that Mr. Rosenberger's gross wages from January 1, 2021, through October 26, 2021, were $240,677.77. $10,000 more than the court determined Mr. Rosenberger received over the course of an entire year. From the arguments presented so far this morning, Your Honors, we should see something of a pattern emerging. Each issue pointed out so far was a result of the trial court fixating on Mr. Rosenberger's financial affidavit and shedding its eyes to other competent, contradicting evidence. As this quote pointed out in In Remarriage of Hubs, a financial affidavit can serve as competent evidence of an asset's value. But whether the financial affidavit is already a month old by the time the trial starts and is seven months old by the time trial ends, then the trial court errs in relying on it exclusively in establishing assets and income values. The trial court commits an even greater error when it clings to the financial affidavit and ignores more credible, contradictory evidence. The inclusions on value presented today and presented in our brief are clearly apparent based on the evidence presented. The manifest weight of the evidence demonstrates that Mr. Rosenberger's bank account should have been valued at $49,700, that Mr. Rosenberger's truck should have been valued at approximately $27,000, and that Mr. Rosenberger's gross income should have been calculated to at least be as high as that reported in his October pay stub. Does the court have any questions on the point so far? Move on. To discuss the second major issue for today's argument, that the trial court improperly weighed certain statutory factors. The trial court abused its discretion in dividing marital property  Now, the relevant factors to consider for both of these arguments are almost identical, being laid out in Section 503D and 504D of the IMDMA. Some of those key factors are the relevant economic circumstances of each spouse, the amount and sources of income of the spouses, and the reasonable opportunity of each spouse for future acquisition of capital assets and income. One key theme runs through this argument, That being that the parties were awarded approximately equal amounts of marital property, approximately equal amounts of marital debt, and yet their incomes are vastly different. Mr. Rosenberger has been consistently employed for many years, and there's no indication that he intends to stop working any time in the near future. So Mr. Rosenberger will receive the benefits of his large income for many years to come. Mrs. Rosenberger, by contrast, has not worked for years. So her actual income is zero, although the court did impute $24,960 for her. For purposes of today's proceeding, we do not dispute the validity of that imputation of income. What we do take issue with is that even though Mr. Rosenberger's real cash income is ten times more than Mrs. Rosenberger's imputed income, the court still ordered her to pay almost the same amount of marital debt as Mr. Rosenberger. However, counsel, wasn't there a large award of maintenance and retroactive maintenance? There was, Your Honor. And was there not a finding by the trial court that a portion of the fees were unreasonable in nature? There was, Your Honor, although we dispute the reasonableness of that finding. And in terms of the standard of review? A piece of discretion, Your Honor. Thank you. Our position is that the court could not have arrived at a conclusion to award approximately equal amounts of marital debt without properly weighing and considering those factors. Now, as to the decision to decline the award of attorney's fees, as this court knows there's well-established precedent for that, Mrs. Rosenberger must show that she is unable to pay her fees and that Mr. Rosenberger is able to pay the fees. So the question is, can Mrs. Rosenberger pay those fees? Because there's no disputing Mr. Rosenberger could with his salary, which is ten times what Mrs. Rosenberger's could be. The trial court previously found at page C119 of the record and ruling on Mrs. Rosenberger's interim fee award, the party from whom attorney's fees and costs are sought has a financial ability to pay reasonable amounts and the party seeking attorney's fees and costs lacks sufficient assets and income to pay reasonable amounts. So the question must be asked, what changed between October 16, 2019, when the court made that finding, and the court's September 22, 2022 judgment? And the answer is only the entry of that judgment, in which, Your Honor, is correct. Mrs. Rosenberger was awarded marital property and maintenance, including retroactive maintenance. But if Mrs. Rosenberger is to pay all the marital debt, I say I'm out of time, Your Honor. Go right ahead and finish it. I would just say, in concluding that thought, that if Mrs. Rosenberger is forced to pay all that marital debt on top of the attorney's fees, then she'll be totally without any maintenance, any retroactive maintenance for sure, or without marital property, being forced to sell that property to pay all that debt. And so a very brief conclusion, Your Honor. For all the reasons stated in our brief and stated today, we ask the court to grant the relief requested in our brief. Thank you. Before we let you go, obviously there's a lot of issues here, and you didn't get to discuss the drug testing. I have a couple questions. I think we all did. We were talking a little bit earlier. I better get my script back out here. And I know opposing counsel in his answer, basically I think their position is that the trial court, by putting this into the order, was not, quote-unquote, restricting her time, because she was given the majority of the pairing time due, I believe, to his work schedule and things such as that. So I think it's their argument, and obviously I don't want to speak for counsel. They'll be able to do that. But basically that the court was not restricting, basically just trying to make sure that Mrs. Rosenberger basically remained clean so she might not, I guess it's not in the best interest of the child, but making sure that she didn't relapse again, because I think there was evidence she relapsed, maybe even fairly close to the time of hearing, if I remember correctly. Correct, Your Honor. It was during the course of the trial that another relapse occurred. So how would you respond to that? Our position is that the authority in which we presume the court was acting, because neither in Mr. Rosenberger's request to the trial court, nor in the trial court's order, did it specify what authority it was acting under. So we are presuming that authority was Section 603.10 of the IMDMA, which the way I perhaps framed in my opening brief was too restrictive. 603.10 is far broader and allows the court to enter essentially any order if the court finds that the parent engaged in any conduct that is seriously endangering the child's mental, moral, physical health, or significant parenting emotional development. So even beyond parenting time, the court did have authority, no doubt, to order a parent to submit to drug tests and probably even to provide those results to Mr. Rosenberger. But the court could not have done that without first making a specific finding, as required in the statute, that the parent engaged in one of those two types of conduct. Because I believe your argument is that the testimony or the evidence was that Mr. Rosenberger never did the drugs with the child present, the child's not put in any endangerment situation, anything such as that, correct? I think I actually made a three-fold argument, Your Honor. Just in back-up to the back-up argument, our first position is that the trial court failed to make any finding as required by the statute, as step one. As step two is exactly what Your Honor stated, that even if the court could have just implied that because Mrs. Rosenberger had a history of drugs, she never did those drugs, there's no evidence that she did drugs on the children, and there's evidence in the record that when the children were placed with Mrs. Rosenberger, they thrived from their condition when they were with Mr. Rosenberger. And then the last position on that issue, Your Honor, is that the court's order itself does nothing to protect the child as required under the statute. Go ahead. Just to piggyback on that. Wouldn't the logic for your argument be that any time a court ordered drug testing, they would have to have a hearing that found emotional or physical harm to the child? Is that the argument that you're making? Is Your Honor asking a hearing specifically on that issue? Well, I mean, how do you order drug testing if you're suggesting to order drug testing, because there is no restriction on parenting time here. None at all. So there is no restriction. So the only way a court then could order drug testing would be to find that there's an emotional or physical harm, is what I'm hearing you say. That's exactly right. Under this authority, Your Honor, that's exactly right. Now, if there's some other authority in the IMDMA I missed, then I would be speaking out of turn. But if we're acting under this authority, that is absolutely correct. Okay. Thank you. Judge? What kind of drugs does the record show she was found to be taking? Definitely methamphetamine, Your Honor. Thank you. Any other questions? Any other drugs? There's a question by Mr. Rosenberger's trial counsel of whether she used cocaine, and her answer is something to the effect of no or not for many years. So I don't want to say no evidence. It could be cocaine as well, but definitely methamphetamine. And how many times was it found in her system during the course of the clerical litigation? It was never found in her system during the course of the litigation. During the April 2022 trial setting, Your Honor, Mr. Rosenberger admits freely that she had relapsed 30 days before. Well, how long has the test worked to find it in the system? That I don't know. Which is, I believe, why the court requested the follicle, because it remained in the follicle versus, say, a urine test. I mean, not just methamphetamine, any drug. It wouldn't be that thing. That might work for some, but for me, that's a policy challenge. We understand that. I appreciate your haircut. Thank you, Your Honor. You look very good up there. Well, I think you could understand the concern with the serious drug use. Absolutely, Your Honor. I think what sets this case apart is that there is evidence that Mr. Rosenberger requested that the kids move back in with Mrs. Rosenberger, knowing that she had this drug history, and that while they were with Mrs. Rosenberger, their condition substantially improved from what it was when they were with Mr. Rosenberger. So I think Your Honor is correct of that initial hesitation with, you could see how this could affect children. But without the presence of the order, if we are acting under 603.10, and given the unique circumstances where the children's condition improved with Mrs. Rosenberger, our position is that the drug testing was inappropriate. And if I can indulge the court, just make one more point. We're in another unique situation, because the only child that's left to be dealt with was born on May 8, 2006. So if the court's order is somehow tied in to that child, as opposed to just being an order, hey, take a drug test, give Mr. Rosenberger the results, then what happens in two weeks when the child turns 18? The court's order isn't clear that it is tied to AR, the last minor child. So it's unclear if Mrs. Rosenberger is stuck doing these tests for the foreseeable future until she's able to get the trial court's order changed if we don't achieve that result today. Obviously, that would be post-dissolution issues after this appeal would be taken care of. Obviously, it might depend on, obviously, I'm sure you've all thought this through already, is the child going to live there? Is the child going off to college? All these things that are speculation, at least from us, at this point you guys probably have a better handle on your clients and their positions. But like you said, we have to get through this process first to get to the next stage. So to speak for everyone. Yes, Your Honor. And I would point out, wouldn't the court lose jurisdiction at that point in time when the child turns 18 and is a non-minor? Wouldn't the trial court? If the order is tied to the child, yes, Your Honor, which isn't entirely clear from the order. You've been very indulgent with me, Your Honor. I'll let Mr. Kiley step up now. Thank you, counsel. Counsel, obviously you'll have your time for your own. Good morning. Please support, counsel. My name is Jack Kiley. Excuse me, I represent the applicant, Michael Rosenberger. I'll start with the drug testing issue since that's fresh. It was pointed out, and I entirely agree, that the issue was the case Mays had cited indicates that the party seeking to restrict parenting time has the burden of proving wife's conduct seriously endangered her minor child. But, again, that's not the issue here. We're not seeking to restrict any parenting time, only that drug testing for that period that would have been relevant, that that be conducted, and that seems not only like an entirely reasonable thing for the court to have ordered, but I think to take the contrary position is somewhat alarming in the sense that the wife is admitting she has this issue. She's going to have custody of her minor child, and that seems like a reasonable assurance to give to the other parent that the custodial parent in those instances is not actively using serious illegal drugs. I think context is always important, correct? And so the trial judge here also heard very strong circumstantial evidence that the wife was withdrawing funds immediately adjacent to gaming parlors throughout the area as well. So during the trial, the judge is hearing evidence of drug use and legal gaming, but nevertheless is being asked to apportion marital assets when some, it appeared that some of those assets were being used for purposes such as drug use and gaming. Starting back at the beginning, the trial court did not err in valuing these items of marital property. Starting with the truck, the plaintiff, or excuse me, the wife concedes that the court's approach using either the NADA or Kelly Blue Book are both appropriate measures, ways to measure or value that vehicle. So I don't think it can be said that because the trial court picked one of those sources versus the other means that the decision was against the manifest way of the evidence. And in particular, it was clear from the order that the trial court took into account the mileage of the vehicle as well as the fact that it did not have a functioning heater. It seems, based on the reply brief of the wife, that they are saying because NADA and Kelly are both, I guess, recognized sources for vehicle valuation that we have to split the difference, and that's simply not the way it works. The judge heard the evidence and picked a source that she thought made more sense in that particular instance, which was the lower value. What was the basis of that decision? The trial court heard both Kelly Blue Book evidence and NADA evidence, and she accepted the NADA evidence, which was a lower value, taking into account high mileage, 285,000 miles and a broken heater. So that number was, again, pulled directly from that. It was a diesel truck? Yes. What year? Thank you. And how many miles? 285,000. Diesels do go longer, as I understand it. And that was a point that was made by the wife's attorney during the trial, for sure, and I don't think there's any disputing that, but I do think in this instance the fact that the number that the trial court stated came from that source that is recognized by admission by a wife, it would be hard for us to then determine that that number was not a credible number to go with. I also think the thrust of the wife's argument appears to be with these alleged miscalculations or failure to follow the statutes, what have you, that we're talking about an equal division versus an equitable division. And so, for example, if the court did not – this is demonstrated, actually, by the fact that they're saying because the husband's bank account was undervalued by $32,000, that that automatically means the wife gets $16,000, which, again, speaks to an equal division versus an equitable division. And that's obviously not what we're looking here. It's not talking about mathematical equality, and we cite to DOTI in that particular respect. The trial court, and we mentioned this in our brief, the trial court heard evidence that the husband had been paying all of the wife's major expenses and giving her over $1,600 a month. And also the husband was ordered to pay $42,499.96 in credit card bills, where his wife was ordered to pay $32,425. And as Justice pointed out, there was the retroactive maintenance for 2019, 2020, and 2021. So it appears to me from the record that the trial court did take all these things into account in an equitable apportionment versus the equal apportionment that it sounds is being advanced here. Also, the idea that the trial court didn't follow the 503D provisions is simply incorrect. The judge went to lengths, it appears to me, to focus on each one of those particular factors. I think it was important here that the trial court found that the wife has a college education. She has a certification for middle school teaching. And at that point in time, she had not been working, and when she had worked, was only receiving minimum wage work, which in the court's mind didn't make a whole lot of sense perhaps, but did certainly impute that $24,000 a year in wages to her. But I do think it's important. They stress the DA in the 503 statute, talking about the age, health, station, occupation, et cetera, of the respective parties. And here we have the situation again with the active drug use, the strong circumstantial evidence of gaming, and things of that nature, and those certainly were factors that were taken into account by the court. I would also point out when we talk about income, all of the cases that are cited dealt with child support issues versus maintenance in the response before the required brief in particular. And I think in that particular instance, while we certainly can see that income is defined the same way for both child support and maintenance, the application in determining maintenance versus support is very, very different, different statutes entirely. And again, it appears very, very clear that the trial court took all those matters into account. Skipping ahead to the attorney's fee issue. If I may interrupt you. With regards to income, I believe the appellant had mentioned that the pay stub had indicated, I think, $240,000. But am I correct that there were a number of expenses that the appellee was claiming could be deducted then for his income? Is that correct? So, correct. Looking at the pay stub, there's a per diem, there's what's called super pay, which had something to do with his travel, and then also reimbursements that were also listed. So, again, I think in those instances, these would have been non-recurring or variable amounts, depending on his work situation and so forth. So I think to affix, as is being suggested, would have been overkill. And in some instances, it might have been under, again, based on his work. But I think to look at his wages was the appropriate measure here, particularly considering the division of everything else that the trial court was handling. There was obviously a lot going on here. Yeah, and along those same lines, there were a number of items that were valued beyond the bank account and the truck. Is that correct? Correct. And if I recall, and hopefully I'm getting this right, the trial court had a hard time valuing some property. Is that correct? Yes. And, in fact, I think part of the order was that the trial court ordered it sold, the property sold, because the trial court couldn't value it. That's exactly right. So it seems to me that the trial court went to great lengths to value various properties. I agree with that. And at this point in time, you have a, we'll call it, for lack of a better kind of a hobby farm in Fayette County. There's also two residences. And you're exactly right, Justice. I think the trial court went to great lengths to try to figure out the best way to go about that. And was that explained with relationship to the vehicle and the bank account and those? The vehicle in particular, it was. The bank account, I don't think it spoke to that directly aside from the fact that in the context of that, as we point out in our brief, there was the discussion that the husband had been paying voluntarily $1,600 a month and all of those things. So in my reading of it, and I wasn't the trial attorney, but in my reading of it, it really did seem as though the court was trying to find that equitable division, taking all those factors into account. And you heard the questions that I asked the appellant's counsel about timing. Can you address the timing of the court's evaluation? Well, and you made a very good point that I, frankly, missed, was the fact that the wife did not submit that affidavit at the same time as the husband had. And I think just from a mechanical standpoint, how are you going to move a docket if we have to come back and do all these things? You're separated by a couple of months. It was the most recent information for both parties. That seems like a pretty sound way to go about it, because particularly just speaking of judicial economy and so forth, it might be weeks or months before they can even get back before that judge, and it would just be continuing to kick this can down the road when these folks needed to be, that relationship needed to be dissolved. So to me, it seemed like a good use of her time, and certainly she was accommodating at every step when it was the wife who was seeking these continuances. And new counsel, you know, counsel withdrawing, then new counsel comes in. So I think in this respect, the court was very accommodating to that schedule, but it's kind of like, you know, this is not an exact science where we have to have these affidavits land on the table at the exact same time for them to, you know. And I think it almost speaks to just the idea that the trial court is more or less selecting the date. That is one of the three factors that counsel had indicated. She's saying, I'm taking the date of your respective affidavits. Yours happens to be here a little bit later than it maybe should be. Thank you. Turning to the attorney's fees, I think that the record speaks for itself in that particular instance. And I think here there's almost a jumping ahead point that we would have to say the wife is automatically entitled to the fees if they're reasonable. That seems to be the argument, particularly in the reply, was that certainly Mr. for now a deceased attorney, that some he accomplished certain things, and I don't dispute that that's a valid point. But it doesn't also mean that you're automatically entitled to the fees because the fees are reasonable. There's the other factors that have to be taken into account. And here, Justice, to your point, a lot of time had passed, and over that course of time, for the wife in particular, her financial circumstances were going to change drastically based on the court's order, which put her in a different position than she was before when, as counsel points out, when the husband was ordered to pay the $7,000 or so to the first attorney, Mr. Erickson. So those circumstances changed in the sense that now she was in a different situation where she could afford to pay whatever the reasonable fees were of Mr. Casey. So in that respect, again, it seems as though the judge spent a great deal of time considering all these factors in an ever-changing dynamic, I might add as well. So unless there's any other questions, that's the extent of my argument. Justice Schovanec? Nothing further. Justice Moore, any other questions? Thank you, counsel. Thank you. Mr. Sullivan, go right ahead with your rebuttal. The issue with becoming over-prepared is then you get too many props, and you forget what you wanted to use the props for. So we'll do what we can. We'll start first with the valuation dates issue. Your Honor asked about that again. I misspoke earlier. This relevant section is 503F of the IMDMA, which states in a proceeding for dissolution of marriage, the court, in determining the value of the marital and non-marital property for purpose of dividing the property, has the discretion to use the date of the trial or such other date as agreed upon by the parties or ordered by the court within its discretion for purpose of determining the value of assets and property. And Section 503K speaks with similar language, although in a slightly different context. The Supreme Court has defined the term trial to include, quote, all proceedings from the time when the parties are called to try their cases in court or from the time when the issue is joined to the time at its final determination. And that is in remarriage of Mathis, 2012 IL 113496. 113496. And I go back to the point I made earlier, Your Honor. If Mr. Rosenberger had won the lottery in April or even May before the last day of the hearing, there's no doubt that money would have been divided between the spouses, regardless of what was stated in his financial affidavit from seven months before. So while, yes, it's unfortunate the trial dragged down for as long as it did, it did. And the statute says the trial date is a date unless the parties agree, which they did not, or the court sets a valuation date, which it did not. Does the court have to specify what date the court is choosing under that statute? I can't say for sure, Your Honor. But you can imagine how it would be best for all parties if the court did. Imagine, for example, that exactly what happened here. Mr. Rosenberger submitted his affidavit in November. Mrs. Rosenberger submitted hers in January. And I understand, Your Honor, the earlier point that, well, Mrs. Rosenberger blew after a continuance. And then there's a lot of discussion about equity versus equality. And we agree an equal distribution is not required, but equitable is. And when you're assigning equal values of marital property, that's unfair. When you're assigning an equal amount of marital debt, that could be fair. But what if the party's income, where there's an ocean between the party's income and only one of them actually has money to pay this debt and the attorney's fees, it is inequitable to pay the spouse with zero income to pay as much as a spouse with all the income. We also spoke, counsel also spoke, excuse me, about the issue of picking one valuation for the truck over the other. And, of course, courts are called to do that all the time, which is more credible. Courts make those judgment calls all the time. But a court can't base its credibility judgment on a mistaken belief of what the evidence was. If the trial court said in its judgment, I don't believe witness X because he said this, and the record shows, nope, he actually never said that. Well, then the appellate court has no choice but to reverse, because what was the court's credibility basis actually based on? As for the pay stub issue, Your Honor, of course I forgot one of my props. You asked about aren't there certain deductions in the gross wages? And Mr. Rosenberger, during cross-examination, said, agreed with counsel that the pay stub showed $240,000 and change. And then he started to say, and if you subtract, And Mr. Casey, trial counsel, said there's no question pending. Your counsel can ask you about that. And Mr. Rosenberger's trial counsel never followed up on that issue. So all the evidence of record shows that he earned $240,000. And even in his own financial affidavit, which, again, we say the trial court over-relied on, in the other category, at page E4 of the record, Mr. Rosenberger included travel pay, super pay, and per diem pay, which are all items which, at first blush, could be excluded from weight income on the pay stub. And then in our reply brief, we also cited Enreid Worrell, 334 ILAP 3550, which, in a case involving a trucker receiving per diem, the appellate court determined that that per diem pay actually constitutes income for purposes of, I can't remember whether it's child support or maintenance, but as Mr. Kiley stated, they are the same definition. With that, I see I'm out of time, Your Honors. So, again, in conclusion, we ask for your relief requested in our brief. Thank you. Thank you, counsel. Before we let you go, Justice Keller, any questions? No. Justice Moore? No questions. Thank you, counsel. Obviously, we'll take the matter under advisement. We will issue an order in due course.